UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

        Plaintiff,

v.

Glenn E. Kotchounian,

        Defendant.

Case No. 24-cr-20078

Hon. Shalina D. Kumar
United States District Judge

---

**United States of America's Sentencing Memorandum**

---

      Even though Glenn Kotchounian has been convicted of felonies several times over, he still acquired numerous guns, over 1,100 rounds of ammunition, and supplies for manufacturing other guns. His lengthy, violent criminal history is compounded by mental health and substance abuse disorders. And making matters worse, his domestic abuse shows that he is dangerous and should not have access to firearms. Because he possessed two machine guns, he has pled guilty to possessing a machine gun under a Rule 11 plea agreement. In light of the factors set forth in 18 U.S.C. § 3553(a), the United States seeks a sentence within the applicable guideline range.

## I. Sentence Considerations

In determining defendant's sentence, the Court must consider the "nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The sentence should reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from further crimes by the defendant, among other factors. 18 U.S.C. § 3553(a)(2). Although advisory, the sentencing guidelines are the "starting point" and "initial benchmark" for the sentence, which should be sufficient, but not greater than necessary to comply with the purposes of § 3553(a)(2). *United States v. Booker*, 543 U.S. 220 (2005); *Gall v. United States*, 552 U.S. 38, 49 (2007).

A sentence falling within a defendant's Guidelines range is presumed reasonable; a sentence falling outside of that range is not presumed unreasonable. *United States v. Christman*, 607 F.3d 1110, 1118 (6th Cir. 2010). When a district court varies below or above the Guidelines, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50. When varying, "we expect the court to explain what distinguishes that defendant's case from a typical one." *United States v. Boucher*, 937 F.3d 702, 708 (6th Cir. 2019). And "the greater the district court's variance, the more compelling the evidence must be." *Christman*,

607 F.3d at 1118. To avoid sentence disparities between similarly situated defendants, the Guidelines provide "a transparent and predictable sentencing range for defendants who fall within the 'heartland' of average cases 'to which the Commission intends individual Guidelines to apply.'" *Boucher*, 937 F.3d at 708. (citations omitted).

    A.    **Nature of the Offense**

On February 2, 2024, Kotchounian lived in a house with his mother, his then four-year-old daughter, and his daughter's mother (girlfriend). (ECF No. 18-5, PageID.69–70.) That morning, Kotchounian screamed at his girlfriend that he was going to slit her throat while they were in the basement together. (ECF No. 18-5, PageID.67–68.) She then fled from the house and sought safety in a neighbor's garage. (*Id.* at 67–68.) The neighbor called 911 for her. (ECF No. 18-3, PageID.60.) The neighbor handed the phone to his girlfriend, who conveyed the following information to 911: Kotchunian was "in the basement; has guns; if police come to house he will shoot; his mother and daughter are in the house; he made threats to kill them; has done this before; and daughter is 5 yrs. old." (ECF No. 18-1, PageID.57 (911 call); ECF No. 18-3, PageID.61.) Kotchounian's mother confirmed later that "she [girlfriend] has no responsibility for him and his weapons . . . he is a three time convicted felon. He was just in jail a couple years ago for threatening to kill us." (ECF No.24, PageID.114.)

3

A few minutes later, officers knocked on the front door. (ECF No. 18-5, PageID.69.) His mother answered and invited the officers into her house. (*Id.*). Officers asked her if she could get Kotchounian to come upstairs from the basement. (*Id.*). She agreed, walked downstairs, and Kotchounian and her emerged from the basement. (*Id.*). His daughter remained in the basement alone. (*Id.*). Officers placed Kotchounian under arrest near the front door and then escorted him to a patrol car parked in the street. (*Id.*).

Officers performed a protective sweep of the basement and discovered Kotchounian's daughter along with his arsenal scattered throughout the room:

- two machine guns, one of which held a large capacity magazine;
- five other guns of various caliber;
- four stripped receivers;
- approximately 1,150 rounds of ammunition;
- body armor; and
- a drill press, jig kits, handwritten notes on firearm assembly, and receipts from the purchase of firearm parts. (PSR ¶¶ 12–15).

Some of the guns are shown below:



While officers were investigating his arsenal, Kotchounian was kicking the interior of the patrol car, damaging the door to the tune of $1,339. (PSR ¶ 16).

B. **Sentencing Guidelines Calculation**

The presentence investigation report calculates the sentencing guidelines at **100–120** months. (PSR ¶ 71). The government agrees with this calculation. Kotchounian fits into criminal history category V for his having 11 criminal history points. (PSR ¶ 44). As for his offense level, his base offense level is 20 because he possessed a firearm capable of accepting a large capacity magazine (26 rounds). (PSR ¶ 22). This base offense level is increased by four levels for possessing between 8–24 firearms. (PSR ¶¶ 13-14, 23). And because he possessed firearms with obliterated serial numbers, he receives a four-level increase. (PSR ¶¶

5

13, 24; Probation Department Addendum, ECF No. 47, PageID.362–63.) A three-level reduction for acceptance of responsibility yields a total offense level of 25. (PSR ¶¶ 30–32). A criminal history category of V combined with an offense level of 25 produces a guideline range of 100–120 months. (PSR ¶ 71).

*Obliterated Serial Number*. Kotchounian's objection to the four-level increase for obliterated serial number lacks merit. USSG § 2K2.1(b)(4)(B)(i) provides for an increase "if any firearm had a serial number that was modified such that the original information is rendered illegible or unrecognizable to the unaided eye." The Sixth Circuit has clarified that § 2K2.1(b)(4) applies if the serial number "is materially changed in a way that makes accurate information less accessible." *United States v. Sands*, 948 F.3d 709, 715 (6th Cir. 2020) (holding that a serial number that is visible to the naked eye is not "altered or obliterated" under § 2K2.1(b)(4)(B)".

Here, investigators sent four of Kotchounian's guns to the Michigan State Police Crime Laboratory for analysis. "Item 3" was a "5.56x45mm NATO caliber, Heckler & Koch, model HK33" firearm. (Exhibit 1: MSP Report). That was one of the machine guns that Kotchounian possessed. (ECF No. 40, PageID.243–44.). The technician noted "no serial number observed" when he received the evidence. (Exhibit 1: MSP Report). So he could not see any number with the naked eye. During the testing, "[s]erial number restoration techniques were applied to items 1

6

through 3 without success." The report describes "[p]ossible secondary serial numbers were located on item 3. A possible serial number of 15*56 was observed on the right side of the magazine well . . . " (*Id.*). A photograph of the gun—after restoration techniques were applied—shows this:



Some of the numbers are clear to decipher; others are not. This firearm's serial number was "materially changed in a way that makes accurate information less accessible" and the partial serial number was not visible to the naked eye. This shows by a preponderance of evidence that the probation department correctly scored this provision.[1]

Kotchounian's claim that it is unclear "whether the number stamped on the firearm is a serial number" is equally meritless. (ECF No. 48, PageID.370.)  As the photograph shows, the firearm has a series of numbers stamped or engraved on it.

---

[1] Exhibit 1 also shows that restoration techniques were applied to the guns described as Items 1 and 2, but "[t]he method of obliteration was too severe." This was distinguished from Item 4, which was a privately made firearm with no serial number present.

7

The Code of Federal Regulations requires firearms to be identified by serial number, that is, "[b]y engraving, casting, stamping (impressing), or otherwise conspicuously placing or causing to be engraved, cast, stamped (impressed) or otherwise placed on the frame or receiver thereof, an individual serial number, in a manner not susceptible of being readily obliterated, altered, or removed." 27 C.F.R. § 479.102. That's exactly what this gun has on it. The numbers engraved on this firearm satisfy this technical definition of a serial number, or any common sense understanding of the term. And the fact that the firearm did not satisfy other ATF technical requirements for proper identification does not make these engraved numbers any less of a serial number. That is akin to arguing that because a license plate does have a registration sticker (affixed to the corner) it is not a license plate.

### C.   History and Characteristics

Kotchounian is a 45-year-old father of three children. Two are adults and one is a minor. (PSR ¶¶ 48, 51). He does not communicate with any of his children. (*Id*.). He has significant mental health concerns, including diagnoses for bipolar disorder and substance use disorder. (PSR ¶ 58). Layered over this challenge, he also has a substantial substance abuse problem involving cocaine, methamphetamine, and heroin. (PSR ¶¶ 61–63). He was unemployed when the police arrested him here. (PSR ¶ 67).

He has a substantial criminal history that reaches back nearly 25 years. Some of his convictions and sentences are set forth below:

| No. | Year | Conviction | Sentence | Citation |
|---|---|---|---|---|
| 1 | 2001 | Assault with a Dangerous Weapon | 122 days jail | PSR ¶ 35 |
| 2 | 2005 | Aggravated Domestic Violence | 60 days jail (violated probation) | PSR ¶ 36 |
| 3 | 2007 | Operating While Intoxicated Causing Serious Personal Injury | 12–84 months in prison (violated parole several times) | PSR ¶ 37 |
| 4 | 2007 | Home Invasion – Second Degree | 18–270 months in prison (violated parole several times) | PSR ¶ 38 |
| 5 | 2007 | Malicious Destruction of Property | 30 days jail | PSR ¶ 39 |
| 6 | 2010 | Operating With the Presence of a Controlled Substance | 365 days jail | PSR ¶ 40 |
| 7 | 2014 | Prisoner Possessing Weapons | 19–60 months in prison, consecutive sentence (violated parole) | PSR ¶ 41 |
| 8 | 2021 | Felon in Possession of a Firearm | 12 months in jail | PSR ¶ 42 |
| 9 | 2021 | Domestic Violence | 12 months in jail | PSR ¶ 42 |
| 10 | 2021 | Domestic Violence | 12 months in jail | PSR ¶ 42 |

The throughline of his lengthy criminal history is his indifference to others. He committed his felonious assault with a knife. (PSR ¶ 33). As for his drunk driving causing a serious injury, he did that to his own six-year-old daughter. (PSR ¶ 37). While drunk, he took her riding on a four-wheeler, removed his hands from the

handlebars, and let her drive. (*Id*.). She crashed it and "broke both bones in her lower left leg." (*Id*.). For his home invasion, he tried to enter the victim's house through a window while the victim was sleeping. (PSR ¶ 38). For his most recent domestic violence convictions, he threatened to kill his mother, girlfriend, and child while possessing firearms. (PSR ¶ 42). When his mother called 911, he "kicked a door in and hit the phone out of her hand and threatened to kill her if she called 911." (*Id*.). But the problems with Kotchounian's characteristics don't end here.

  ***Domestic Abuse***. In his sentencing memorandum, he describes growing up in a violent and unstable home due to his father's behavior. (ECF No. 48, PageID.365.) And he explains that he "experiences extreme paranoia" because of bipolar disorder. (*Id*. at 366). But instead of taking medication, learning from painful experiences, and otherwise trying to address his mental health, he has trained his paranoia and violence on those he lived with. Kotchounian's mother characterizes his conduct toward his girlfriend as "reprehensible." She admits that Kotchounian's conduct toward his girlfriend was far worse than her ex-husband's (Kotchounian's father) conduct ever was toward her.[2] She has seen bruises on the

---

[2] Kotchounian's mother disputes some of the factual claims in his sentencing memorandum. For example, she moved to Colorado about three months before Kotchounian turned 18 years old. She divorced her husband when Kotchounian was 14 years old. Kotchounian chose to live with his father when he was 14 years old. She did not witness her husband beat Kotchounian "until he bled" or otherwise. She also was not attacked "countless times" and frequently injured by

girlfriend's neck after he strangled her. She has heard him threaten his girlfriend numerous times. And she disclosed that he exercised "extreme control" over his girlfriend.

His girlfriend has confirmed his extreme control in several ways. As an example, Kotchounian would not allow her to have her own cell phone even though she is in her forties. To further isolate her, he repeatedly assaulted her and threatened her. Due to his extreme paranoia, he falsely accused her of infidelity at times. In one instance, he became convinced that she was unfaithful with his cousin, Danny. So he threatened her and forced her to sit for him while he tattooed "*Danny is a bitch*" on her right arm. He then uploaded a photograph of this tattoo to Facebook. She never wanted this tattoo on her body. Nor to be humiliated on social media. Some time later—after her repeated requests—he tattooed over it to conceal it. Since his arrest, she has been in therapy to work through the trauma he inflicted on her.

Kotchounian's conduct is dangerous and beyond reprehensible. And there's a level of indifference, depravity, and violence toward others that bipolar disorder or substance use disorder does not and cannot explain.

---

assaults. She agrees that Kotchounian's father was not a good person and was sometimes violent, but to a lesser extent than is described in his sentencing memorandum.

### D. Seriousness of the offense, protection of the public, and unwarranted sentencing disparities.

Possessing machine guns is a serious offense as reflected by the significant maximum penalty of ten years that Congress has imposed. A gun that fires quickly gives targets no time to protect themselves. And guns that fire automatically are not needed for self-defense, nor protection of one's home. Kotchounian has at least five felony convictions. He has spent years in prison or jail. And yet he possessed numerous guns, over 1,000 rounds of ammunition, and tools to assemble guns from mail order kits. This shows he has no respect for the law. And calling it "a hobby" does not mitigate the offense or reduce its significance.

His history and characteristics call for a lengthy sentence to protect the public from him. Over the last quarter century, he has amassed many convictions and has repeatedly violated parole conditions. And a person with his mental state should be prevented from having access to machine guns for a very long time. A substantial prison sentence is the only way to ensure public safety. And he's been given lots of opportunities to show he is not a threat or danger to others over the years. But his paranoid, threatening, and violent behavior endures.

As for similarly situated defendants, Sentencing Commission data shows that for those defendants that received a prison sentence the average length of imprisonment was 90 months and the median length imposed was 100 months. (PSR ¶ 98).

## II.     Conclusion

The government recommends a sentence of 110 months based on the factors set forth in 18 U.S.C. § 3553(a). The government also requests a minimum term of two years supervision to follow any term of incarceration.

                                            Respectfully submitted,

                                            Jerome F. Gorgon Jr.
                                            United States Attorney

Dated: Sept. 18, 2025                 <u>s/Blaine Longsworth</u>
                                            Blaine Longsworth (P55984)
                                            Assistant United States Attorney
                                            210 Federal Building
                                            600 Church Street
                                            Flint, Michigan 48502
                                            Telephone: (810) 766-5031
                                            Email: blaine.longsworth@usdoj.gov

## **CERTIFICATE OF SERVICE**

      I hereby certify that on September 18, 2025, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

      All Attorneys of Record

Dated: September18, 2025                  s/ Kristi Bashaw
                                                   United States Attorney's Office